**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | CASE NO. 22-CV-3553 (VM) |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT JOHN D. ROBSON'S MOTION TO DISMISS AMENDED COMPLAINT** |
| DAVID LEE STONE and JOHN D. ROBSON, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| HAROLD J. STONE, GWENDOLYN STONE, JUSTIN BLAKESLEY, and BRETT R. ADAMS | ) ) ) ) | |
| Relief Defendants, | ) | |

# TABLE OF CONTENTS

I.  The Amended Complaint Fails to Plead a Strong Inference of Scienter. ...........................1

II.  The Amended Complaint Fails to Allege that Robson Aided and Abetted Stone.............5

III.  The Amended Complaint Fails to State a Claim under Section 20(b)...............................6

IV.  *Liu* Forecloses Disgorgement in this Case.......................................................................7

CONCLUSION...................................................................................................................10

## **TABLE OF AUTHORITIES**

### **Cases**

*Cohen v. Citibank, N.A.*, 954 F. Supp. 621 (S.D.N.Y. 1996) ...........................................................6

*Dirks v. SEC*, 463 U.S. 646 (1983) ...................................................................................................2

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ....................................................................................... 9-10

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419 (2d Cir. 2011)...................................................3

*Liu v. SEC*, 140 S. Ct. 1936 (2020)..............................................................................................7, 9

*O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F. Supp. 1179 (S.D.N.Y. 1981)........8

*SEC v. Ahmed*, 263 F. Supp. 3d 381 (D. Conn. 2016)......................................................................8

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ...............................................................................5, 6

*SEC v. Blackburn*, 15 F.4th 676 (5th Cir. 2021)..............................................................................8

*SEC v. Caledonian Bank, Ltd.*, 145 F. Supp. 3d 290 (S.D.N.Y. 2015) ...........................................8

*SEC v. Church-Koegel*, No. 20-8480, 2021 WL 6104157 (C.D. Cal. Sept. 19, 2021) ...................8

*SEC v. City of Victorville*, No. 13-00776, 2013 WL 12133651 (C.D. Cal. Nov. 14, 2013) ...........8

*SEC v. DiBella*, 409 F. Supp. 2d 122 (D. Conn. 2006) ...................................................................8

*SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009).......................................................................1, 2, 4

*SEC v. Dubovoy*, No. 15-6076, 2016 WL 5745099 (D. N.J. Sept. 29, 2016) ............................5, 7

*SEC v. Levin*, 232 F.R.D. 619 (C.D. Cal. 2005) .............................................................................8

*SEC v. Rio Tinto PLC*, No. 17 Civ. 7994, 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ......... 7-8

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) ......................................................................8

*SEC v. Strebinger*, 114 F. Supp. 3d 1321 (N.D. Ga. 2015) ...........................................................6

*SEC v. Thompson*, 238 F. Supp. 3d 575 (S.D.N.Y. 2017).............................................................1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)................................................2

*Van Buren v. United States*, 141 S. Ct. 1648 (2021) ......................................................................4

**<u>Statutes and Rules</u>**

Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)).................................................................7

Section 20(b) of the Exchange Act (15 U.S.C. § 78t(b)).............................................................6

15 U.S.C. § 78u............................................................................................................9, 10

SEC Rule 10b-5 (17 C.F.R. § 240.10b-5)........................................................................7

**<u>Other Authorities</u>**

*Leak, Merriam-Webster.com Dictionary,* https://www.merriam-webster.com/dictionary/leak......5

To state a claim of either direct or secondary liability under Section 10(b) and Rule 10b-5, the SEC must sufficiently allege facts to support a strong inference that Robson acted with scienter. The Amended Complaint fails to do so and, in arguing otherwise, the SEC both misconstrues the elements it must plead and omits aspects of its own factual allegations and incorporated documents that are fatal to its claims.  In short, the SEC alleges that Robson participated, with scienter, in a "hack-to-trade" scheme, yet it fails to allege any facts to establish that Robson was even aware of the alleged "hacking," let alone that he endorsed its commission.  Dismissal is thus appropriate of the First and Second Claims because the SEC cannot support a strong inference of scienter and thus the Court can infer "no more than the mere possibility of misconduct from the factual averments." *SEC v. Thompson*, 238 F. Supp. 3d 575, 587 (S.D.N.Y. 2017).  As to the Third Claim, the SEC seeks only to evade the flaws in the first two by advancing an unprecedented and incorrect interpretation of Section 20(b).  Finally, even if the Court does not dismiss the claims outright, the SEC cannot justify its request for disgorgement against Robson in a case that, by its very nature, does not include any identifiable investor victims.  The Court should, at a minimum, say so now.

## I.     The Amended Complaint Fails to Plead a Strong Inference of Scienter.

The First Claim alleges Robson violated Section 10(b) and Rule 10b-5 by trading on information that someone else—namely, Stone—obtained through deceptive conduct.  Those allegations place Robson in the same alleged role as a "tippee" in a traditional insider-trading scheme, but the SEC has failed to sufficiently allege the requirements for imposing liability on someone in that role—*i.e.*, knowledge of the deception through which the information was obtained sufficient to make the tippee an after-the-fact participant in the principal wrongdoer's fraudulent conduct.  *See* Mot. 7-16.  The SEC's contrary arguments are unpersuasive.

Although the SEC superficially disputes that Robson is in the position of a traditional tippee, that labeling disagreement is immaterial.  *SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009)

1

and its progeny do not (and could not) hold that the recipient of non-public information in a "hack-to-trade" case may be held liable for securities fraud without some knowledge that the information was obtained through wrongful and deceptive conduct (*i.e.*, a "hack"). That requirement derives from the Supreme Court's authoritative interpretation of the Exchange Act. *See* Mot. 8-9. *Dorozkho* and its progeny stand only for the proposition that, in addition to breaches of fiduciary duties, non-duty based, affirmative acts of fraud such as "computer hacking could be . . . a 'deceptive device or contrivance'"—*i.e.*, the wrongful conduct—on which a violation of Section 10(b) and Rule 10b-5 might be based. *Dorozhko*, 574 F.3d at 51. But the alleged hacking in this case—and thus the relevant deceptive conduct—was committed by Stone, not Robson. To hold Robson liable for trading on the information obtained through that hacking, Robson must have possessed sufficient knowledge of it to be considered a "participant after the fact" in the deceptive conduct through which the information was fraudulently obtained. *Dirks v. SEC*, 463 U.S. 646, 659-60 (1983). The SEC thus correctly does not dispute that to state a claim, it must adequately allege that Robson acted with "some knowledge that the information [he traded on] was improperly obtained through deceptive conduct," Mot. 8; *see* Resp. 15—*i.e.*, that he acted with scienter.

The SEC contends that it has adequately alleged Robson's scienter by asserting that he "had actual knowledge, consciously avoided knowing, or was reckless in not knowing of Stone's deceptive conduct." Resp. 9. But to state a claim for securities fraud, the SEC must do more than merely assert knowledge in a conclusory manner; it must plead sufficient *facts* to create a "*strong* inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis added). In evaluating the sufficiency of the allegations, moreover, the court must consider "whether *all of the facts* alleged, taken *collectively*, give rise to [such] a strong inference . . . , not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*

2

(emphasis added).  The Court must consider "the *full factual picture* presented by the complaint, the particular cause of action and its elements, and *the existence of alternative explanations* so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011) (emphasis added).

Here, as explained in the opening brief, the SEC's assertions are not only unsupported, but are, in important ways, *contradicted* by its own allegations and documents incorporated into the complaint.  Despite possessing significant email and text correspondence between Robson and Stone, in defense of its complaint, the SEC can muster only a few allegations that even purportedly show Robson's scienter, namely: (1) Robson repeatedly traded ahead of the Motley Fool's stock pick announcements; (2) the Motley Fool's terms of service prohibited unauthorized access to the site; and (3) Stone told Robson what they were doing could be considered insider trading; told Robson he could not "see" certain picks "ahead of time"; and told him that the information was "leaked."  Resp. 15.  None of those allegations supports an inference that Robson knew or had reason to know that Stone obtained the stock picks through a deceptive "hack-to-trade" scheme.[1]

First, the mere fact that Robson traded ahead of the Motley Fool's stock pick announcements cannot establish a "strong" inference of scienter, because trading ahead of the picks says nothing about *how* the picks were acquired—whether innocently or deceptively, let alone through a "hack-to-trade" scheme.  Second, that Motley Fool's terms of service prohibited unauthorized access does nothing to establish any knowledge that unauthorized access *had actually* occurred or how it was accomplished.  To the contrary, Stone and Robson subscribed to

---

[1] The SEC's assertion that it can create a strong inference of scienter by alleging merely that Robson had access to the information and a generic motive to make money is clearly wrong.  *See* Resp. 15.  If that were sufficient to create a strong inference of scienter, there would be little left of the scienter requirement in insider-trading cases.  It is also especially specious with respect to someone situated as an alleged tippee like Robson.  The SEC alleges "opportunity" based on "accessing information deceptively obtained," Resp. 15, yet this wholly *presumes* an awareness that the information was obtained by someone else through deceptive conduct.

the Motley Fool, and thus Robson knew Stone had *legitimate* access to the Motley Fool's website. *See* Am. Compl. ¶ 27.   More fundamentally, mere unauthorized access is not deception, *cf. Dorozhko*, 574 F.3d at 51 ("It is unclear, however, that exploiting a weakness in an electronic code to gain unauthorized access is 'deceptive,' rather than being mere theft."), and courts are highly reluctant to premise liability on a breach of private terms of service, *see Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (reversing Computer Fraud and Abuse Act conviction).

Third, none of Stone's statements to Robson provide any further support to the SEC's assertion.   The SEC does not contend there are any allegations that Stone ever told Robson he used stolen credentials to obtain the Motley Fool's stock picks.   And, as explained in the opening brief, the statements the SEC does identify, in context, actually strongly suggest the Robson *did not know* and *should not have known* that Stone was obtaining the information through deceptive hacking. As for Stone's legal pontificating of what might constitute insider trading (Am. Compl. ¶ 38), it is irrelevant to the question of what Stone told Robson he was actually *doing* to obtain the picks. Moreover, the SEC omits from its quotations Stone's statement that he believed what he and Robson were doing (at least as he falsely described it to Robson) was, in fact, lawful and that it would be a "stretch" to consider it unlawful.   *Compare* Resp. 6 *to* Am. Compl. ¶ 38.

Reading this email in conjunction with others around the same time supports the conclusion that Robson had *no idea* that Stone was actually using illicitly obtained credentials to log into Motley Fool's systems.   For example, on January 13, 2021, only three days before Stone sent Robson the email in which he referenced insider trading, Robson sent a text to Stone asking him to show Robson how to "dig out the info on the site."   Am. Compl. ¶ 37.   Taking the pleaded factual allegations together, as the Court should, indicates that Stone gave Robson an inaccurate impression of what he was actually doing and that the information was available on the website

4

for anyone with the requisite technical capacity.

Finally, Stone's repeated description to Robson of the information as having been "leaked" is the polar opposite of hacking.  Robson no doubt understood Stone's description to mean, consistent with the dictionary definition, that Stone was obtaining information the Motley Fool intended to keep confidential until its recommendations were officially released.  But it would not have been reasonable for Robson to understand Stone to be claiming to have obtained that information through hacking.  The only reasonable way to interpret Stone's statements is that, notwithstanding the Motley Fool's attempts to keep the information confidential, the company had prematurely made it accessible "by a fault or mistake."  *Leak*, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/leak.  Put simply, if information has "leaked out," there is no need or reason to hack in.

## II.    The Amended Complaint Fails to Allege that Robson Aided and Abetted Stone.

The SEC's claim that Robson aided and abetted Stone's securities fraud fails for similar reasons.  Indeed, the SEC does not dispute that its aiding-and-abetting claim depends on Robson's knowledge of Stone's underlying violation.  *See SEC v. Apuzzo*, 689 F. 3d 204, 211 (2d Cir. 2012). Because the SEC fails to adequately allege that Robson possessed any knowledge of Stone's fraud, it also cannot establish that Robson aided and abetted that fraud—even if Robson's conduct provided Stone substantial assistance.  *See* Mot. 16-17.

But the SEC's allegations of "substantial assistance" are also inadequate.  *See* Mot. 17-18. The SEC does not dispute that whether a defendant has rendered substantial assistance must be considered in light of the degree of his knowledge.  Unlike *SEC v. Dubovoy*, No. 15-6076, 2016 WL 5745099 (D.N.J. Sept. 29, 2016), this is not a case involving sophisticated traders and communications inaccessible by the SEC.  The SEC has access to detailed communications between two friends with no alleged trading expertise.  Even assuming that the SEC could allege

recklessness on the part of Robson, there is no plausible basis to conclude that he lawfully purchased a Motley Fool subscription, lawfully traded in non-recommended picks, or lawfully used secure email in an effort to "associate himself" with an *unlawful* venture (a "hack-to-trade" scheme) he did not actually know was taking place. *See Apuzzo*, 689 F.3d at 206. He did not, in other words, "consciously assist[] the commission of [a] specific [wrongdoing] in some active way." *Id.* at 212 n.8 (citation omitted).

### III.    The Amended Complaint Fails to State a Claim under Section 20(b).

The SEC also fails in claiming that Robson violated Section 20(b) by "do[ing] an[] act or thing which it would be unlawful for [him] to do under the [Act] or any rule or regulation thereunder through or by means of" Stone. 15 U.S.C. § 78t(b). As the opening brief explained, the SEC asks the Court to go against the weight of authority, including in this circuit and district, to hold that Robson can be held liable under Section 20(b) for committing securities fraud through another person without showing he "knowingly used [a] controlled person to commit [an] illegal act." *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 630 (S.D.N.Y. 1996). *See* Mot. 18-20. The Court should follow the prevailing view that Section 20(b) contains a control element, which the SEC has concededly failed to allege, and dismiss the Third Claim on that basis.

But dismissal is warranted even if control is not a formal element of a Section 20(b) claim. As even *SEC v. Strebinger*, 114 F. Supp. 3d 1321 (N.D. Ga. 2015), recognized, Section 20(b) is intended to prevent a defendant from escaping liability by structuring a fraudulent scheme so that an innocent third party actually commits the act that violates the law. In *Strebinger*, the defendant arranged for unwitting third parties to make material misstatements, and the court held that Section 20(b) prevented the defendant from evading liability under Rule 10b-5. *See id*. at 1335 (Section 20(b) "allows the SEC to pursue claims against individuals that perpetrate fraud through the use of non-culpable third parties"). That does not describe the SEC's allegations in this case.

Stone is plainly not a non-culpable party and Robson did not "use" him to commit any unlawful act. That is so not because one person must have committed all the relevant conduct, *cf.* Resp. 20, but because a Section 20(b) defendant must have committed at least *one* violation of the securities laws through *another person*. Robson engaged in the allegedly wrongful trades himself.

The SEC's position that deceptively accessing non-public information is itself a violation of the securities laws would write out the requirement that the alleged deceptive device be used "in connection with the purchase or sale of a[] security." 15 U.S.C. § 78j(b); *see* 17 C.F.R. § 240.10b-5. *Dubovoy* is not to the contrary. The fraudulent scheme in that case was not merely hacking, but hacking *and* tipping others with the intent that they trade on the information. Stone engaged in that conduct here on his own accord. If the SEC could state a Section 20(b) claim solely by virtue of Robson's receiving and trading on the tipped information—whether or not Robson had any knowledge of (much less control over) Stone's deceptive conduct, the SEC could readily evade that important guardrail on tipper-tippee liability. We are aware of no court that has sanctioned that approach to Section 20(b), and the SEC cites none.

## IV.    *Liu* Forecloses Disgorgement in this Case.

Finally, the Court should reach and decide the availability of disgorgement as a remedy for the alleged violations in this case. The Supreme Court's holding in *Liu* is clear: "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Liu v. SEC*, 140 S. Ct. 1936, 1948 (2020). Yet that is exactly what the SEC seeks to do here. *See* Mot. 21-25.

There is nothing premature about reaching that conclusion, as a matter of law, at the pleading stage. *Cf.* Resp. 20-21. District courts frequently consider and resolve whether the SEC is authorized to seek disgorgement based on the pleadings, including in this circuit and in the very cases on which the SEC relies. *See, e.g.*, *SEC v. Rio Tinto PLC*, No. 17-CV-7994, 2019 WL

1244933, at *21-22 (S.D.N.Y. Mar. 18, 2019); *SEC v. Ahmed*, 263 F. Supp. 3d 381 (D. Conn. 2016); *SEC v. City of Victorville*, No. 13-00776, 2013 WL 12133651 (C.D. Cal. Nov. 14, 2013); *SEC v. DiBella*, 409 F. Supp. 2d 122, 127-35 (D. Conn. 2006).  Like the rest of the motion to dismiss, Robson's challenge to disgorgement accepts the SEC's factual allegations as true and seeks a ruling on the relief as a matter of law.  Indeed, for purposes of his disgorgement argument, Robson accepts even that the SEC has asserted viable claims for relief.  The argument thus presents precisely the sort of "discrete issue of law" that the Court's individual practices suggest the Court prefers to resolve in a timely manner.  Rule II.C, Individual Practices.  Resolving the question now is particularly appropriate in light of the asset freeze premised, in part, on the disgorgement request.[2]

Turning to the merits, this is not an appropriate case for disgorgement because there are no identifiable investors for which disgorgement may be sought.  The only case cited by the SEC to support its contrary assertion is a 40-year-old, non-binding decision discussing Article III standing, not the availability of disgorgement.  *See O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 529 F. Supp. 1179, 1187-88 (S.D.N.Y. 1981).[3]  Disgorgement is inappropriate in insider-trading cases because insider trading "injures the market as a whole rather than individual market participants." *SEC v. Blackburn*, 15 F.4th 676, 682 (5th Cir. 2021).  Deceptive hack-to-trade schemes operate in

---

[2] For those reasons, the Court should decline to follow the only post-*Liu* case on which the SEC relies, *SEC v. Church-Koegel*, No. 20-8480, 2021 WL 6104157 (C.D. Cal. Sept. 19, 2021), which misconstrued the two cases on which it relied to find a *Liu*-based challenge to disgorgement premature at the pleading stage.  *See id.* at *2 (citing *SEC v. Levin*, 232 F.R.D. 619 (C.D. Cal. 2005); *SEC v. Caledonian Bank, Ltd.*, 145 F. Supp. 3d 290 (S.D.N.Y. 2015)).  In *Levin*, the challenge was apparently based merely on the SEC's purported failure to state a substantive claim.  *See* 232 F.R.D. at 624-25.  And in *Caledonian Bank*, the challenge turned on both factual and legal disputes concerning whether the defendant was jointly and severally liable with his co-defendants.  *See* 145 F. Supp. 3d at 310.

[3] It makes no difference that the SEC has alleged that Robson and Stone purchased options, in addition to stocks, based on non-public information.  Insider trading cases often involve purchasing options, and the parties on the other side of options contracts are no more defrauded than the parties on the other side of the stock transactions.  In either case, any hypothetical market-participant victims, and their losses, "are difficult if not impossible to identify." *United States v. Royer*, 549 F.3d 886, 904 (2d Cir. 2008) (citation omitted).

the same manner with respect to the investing public.

The SEC contends that *Liu*'s prohibition on disgorgement for violations without identifiable victims or losses derives solely from Section 78u(d)(5)'s limit on the SEC's authority to seek "equitable relief" only where "appropriate or necessary for the benefit of investors."  Resp. 22 (quoting 15 U.S.C. § 78u(d)(5)).  Here, the SEC argues it is seeking disgorgement under Section 78u(d)(7), which does not contain the same limitation.  Resp. 23-24; *see* 15 U.S.C. § 78u(d)(7) (authorizing the SEC to seek "disgorgement").   But as *Liu* recognized, disgorgement *is* an equitable remedy.  *See* 140 S. Ct. at 1942-43.  There is no reason that Congress's post-*Kokesh* affirmation of the SEC's authority to seek that equitable remedy should be interpreted to authorize the SEC the seek it for the benefit of anyone other than investors.  *Cf. id*. at 1947 (explaining that Congress's use of "disgorgement" in other statutes, as reference to "relief permitted by § 78u(d)(5)" should not be understood to "silently rewrite the scope of what the SEC c[an] recover").   In any event, *Liu*'s prohibition is not based solely on the "benefit of investors" limitation.  Rather, it derives also from the equitable nature of the disgorgement remedy itself.  *See id.* at 1942 ("[T]o avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits *to be awarded for victims.*") (emphasis added).

The SEC points to *Liu*'s statement that the "equitable nature" of the disgorgement remedy only "*generally* requires the SEC to return a defendant's gains to wronged investors" and the Court's recognition of "an open question whether, and to what extent," the SEC may deposit disgorged funds with the Treasury "when 'it is infeasible to distribute the collected funds to investors.'"  Resp. 22-23 (quoting *Liu*, 140 S. Ct. at 1948).  But this is not a case in which it may prove to be only "infeasible" to distribute disgorged funds to some even conceivably identifiable pool of investors—much less identified.  It is a case where there are no identifiable investors that

were harmed in a manner different from the market as a whole.

Contrary to the SEC's assertion, recognizing and enforcing that longstanding equitable limitation on "disgorgement" would not deprive the NDAA amendment that added Section 78u(d)(7) of any "real and substantial effect."  Resp. 24.  Nor would it require concluding that Congress inadvertently omitted "for the benefit of investors" from the new provision.  *Id.*  As Robson explained in his opening brief (and the SEC does not dispute), Congress drafted Section 78u(d)(7) in the immediate aftermath of the Supreme Court's questioning whether Section 78u(d)(5) included the authority to ever seek disgorgement for wronged victims.  *See* Mot. 22-25 (describing timeline and canvasing statements).[4]  Although the provision was ultimately enacted (without further comment) after *Liu* confirmed that authority, the provision continues to serve as an important predicate for the contemporaneously enacted disgorgement-specific statute of limitations that provides the SEC greater flexibility to pursue disgorgement than the Supreme Court allowed in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017).

This Court should not follow the other courts who have grasped the first excuse offered by the SEC to cast *Liu* aside and return to the very practices that the Supreme Court stated were outside the scope of the disgorgement remedy.  In a case such as this one where there is no possibility (not just a mere impracticality) that any disgorged funds would be returned to defrauded investors, disgorgement is unavailable to the SEC at a matter of law.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed.

---

[4] Although the SEC suggests that Congress omitted the "benefit of investors" limitation in Section 78u(d)(7) as a response to *Liu*, that phrase was never present in *any* draft of the provision—pre- or post-*Liu*.  The better explanation for its absence is that, because disgorgement is itself an "equitable remedy" limited by Section 78u(d)(5) and, unlike some equitable remedies, is inherently limited to seeking compensation for victims, the phrase was doubly unnecessary in Section 78u(d)(7).  *See* pp. 9-10, *supra*.

/s/ Jason H. Cowley
Jason H. Cowley
Jonathan Y. Ellis
Roy G. Dixon, III
McGuireWoods LLP
jcowley@mcguirewoods.com

Nathan Pittman
Nevin, Benjamin & McKay LLP
npittman@nbmlaw.com

*Counsel for John D. Robson*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on January 6, 2023 a true and correct copy of the foregoing

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT JOHN D. ROBSON'S MOTION

TO DISMISS AMENDED COMPLAINT was filed electronically with the Clerk of the Court

using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ Jason H. Cowley
_____
Jason H. Cowley
McGuireWoods LLP

*Counsel for John D. Robson*