**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/29/2023
```

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | **22 Civ. 3553 (VM)** |
| Plaintiff, | <u>**DECISION AND ORDER**</u> |
| - against - | |
| DAVID LEE STONE and JOHN D. ROBSON, | |
| Defendants, | |
| and | |
| HAROLD J. STONE, GWENDOLYN STONE, JUSTIN BLAKESLEY, and BRETT R. ADAMS, | |
| Relief Defendants. | |

**VICTOR MARRERO, United States District Judge.**

Defendant John D. Robson ("Robson") and relief defendants Justin Blakesley ("Blakesley"), Brett R. Adams ("Adams"), and Harold Stone ("Stone Sr.," collectively the "Movants") move to dismiss the Securities and Exchange Commission's ("SEC") amended complaint (see "Amended Complaint," Dkt. No. 97) pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the reasons stated below, Robson's motion is **DENIED**, Blakesley's motion is **DENIED**, Adams's motion is **DENIED**, and Stone Sr.'s motion is **DENIED**.

## I.   <u>BACKGROUND</u>[1]

A.   <u>FACTUAL HISTORY</u>

The Motley Fool, LLC ("Motley Fool") is a private company that provides both free and subscription-based investment guidance to individual investors through its website, www.fool.com. Two of the Motley Fool's premium, subscription-based services are Motley Fool Stock Advisor ("Stock Advisor") and Motley Fool Rule Breakers ("Rule Breakers"), both of which provide access to analyst reports, investment trend analysis, and new stock picks each month. Stock Advisor typically announces a new stock buy recommendation to its subscribers at approximately 1:00 PM ET on the first and third Thursday of each month. Similarly, Rule Breakers typically announces a new stock buy recommendation to its subscribers at approximately 11:00 AM EST on the second and fourth Thursday of each month.

In mid-2020, David Stone ("Stone"), a Motley Fool subscriber, noticed that following the Motley Fool's announcement of its stock buy recommendations, the price and trading volume of the recommended stocks would rise, and

---

[1] Except as otherwise noted, the following background derives from the Amended Complaint. The Court takes all facts alleged therein as true and construes all justifiable inferences arising therefrom in the light most favorable to the plaintiff, as required under the standard set forth in Section II below.

related stock options[2] moved with the stock. Based on this observation, Stone looked for ways to identify the Motley Fool's recommendations before they were publicly announced. To that end, in October 2020, Stone illicitly obtained login credentials for the Motley Fool, which did not belong to him, that he used to access the Motley Fool's content management system and view the Stock Advisor and Rule Breakers's recommendations before they were publicly announced. The next month, Stone began to use the information gleaned from his illicitly obtained credentials to make profitable stock trades ahead of the release of the recommendations. The same month, brokerage accounts belonging to Stone's wife, Gwendolyn Stone, and Stone's father, Harold Stone, began making purchases and sales that mirrored Stone's activity.

Then, beginning in at least January 2021, John Robson, a friend of Stone and also another Motley Fool subscriber, began participating in Stone's trading scheme. Stone relayed the Motley Fool's recommendations to Robson before they became public, provided Robson with guidelines about trading using the recommendations and avoiding regulatory attention, and provided other specific advice. Stone and Robson

---

[2] A stock option gives the purchaser of the option the right to buy or sell shares of a specific stock at a specified price before a set expiration time. A call option is similar but gives the purchaser the right to purchase shares of a specific stock at a specified price before a set expiration time, rather than the right to buy or sell.

communicated through a variety of channels, including text and encrypted emails. Over the next year, Stone and Robson would follow the same weekly ritual. Stone would access the Motley Fool's recommendations before they became public and notify Robson of what the recommendations would be, and then Stone and Robson would purchase positions in the recommended stock, typically including call options that would expire within a week. These purchases normally took place on Wednesday or Thursday mornings, prior to Motley Fool's release of the recommendations. Once the recommendations were announced, Stone and Robson would sell their positions, regularly obtaining significant profits.

Brokerage accounts belonging to Justin Blakesley and Brett Adams, friends of Robson, followed suit. Blakesley and Adams opened their accounts in February and June 2021, respectively. Their brokerage accounts subsequently followed the same pattern of stock purchases and sales as Robson, frequently occurring within minutes of each other. Nearly all of the trades in these accounts were Motley Fool recommendations, and there was significant overlap between the IP addresses used to log in to Robson's, Blakesley's, and Adams's accounts, consistent with either one person placing all of the trades in those accounts, or multiple people being in the same location when placing trades.

By the time the scheme was discovered in the spring of 2022, Stone had accrued more than $3.9 million, Robson had accrued more than $3 million, an account in Stone Sr.'s name accrued more than $960,000, an account in Gwendolyn Stone's name accrued nearly $1.5 million, an account in Blakesley's name accrued more than $1 million, and an account in Adams's name accrued more than $2.1 million.

B.   <u>PROCEDURAL HISTORY</u>

On September 2, 2022, the SEC filed its Amended Complaint. Prior to and following the filing of the Amended Complaint, the SEC and Movants engaged in the exchange of pre-motion letters in anticipation of motions to dismiss by Movants. (<u>See</u> Dkt. Nos. 77-78, 82-84, 86-87, 90-91, 99-100, 102, 111, 116-118, 127, 132.) In the interest of efficiency, the Court directed Movants to confer and inform the Court as to the viability of a joint motion. (<u>See</u> Dkt. No. 134.) Movants subsequently informed the Court that, while they anticipated certain similar issues could be raised in a joint motion, separate motions would be necessary to address issues unique to individual movants. (<u>See</u> Dkt. No. 149.) The Court then directed Movants and the SEC to inform the Court if they sought full or supplemental briefing or whether they consented to the Court deeming the letters exchanged a fully

briefed motion to be ruled on. (See Dkt. No. 157.)[3] Movants and the SEC informed the Court that at least one party requested full briefing on each of the anticipated motion to dismiss issues, and they provided the Court with a proposed briefing schedule, which the Court adopted. (See Dkt. Nos. 160, 162.)

On December 1, 2022, Robson, Blakesley, and Adams filed their motions to dismiss (See "Robson Motion," Dkt. No. 172; "Blakesley Motion," Dkt. No. 174; "Adams Motion," Dkt. No. 176) with accompanying memorandums of law in support of the motions. (See "Robson Memorandum," Dkt. No. 173; "Blakesley Memorandum," Dkt. No. 175; "Adams Memorandum," Dkt. No. 177.) The same day, Stone Sr. filed a motion to dismiss, joining specific portions of the other motions and memorandums. (See "Stone Sr. Motion," Dkt. No. 178.) Then, on December 22, the SEC filed its memorandums of law in opposition to the Robson Motion, Blakesley Motion, Adams Motion, and Stone Sr. Motion. (See "Robson Opposition," Dkt. No. 185; "Blakesley Opposition," Dkt. No. 187; "Adams Opposition," Dkt. No. 186; "Stone Sr. Opposition," Dkt. No. 188.) Finally, on January 6, 2023, Robson, Blakesley, Adams, and Stone Sr. filed their

---

[3] Separately, the Court directed Adams, Blakesley, and the SEC to submit a briefing schedule for anticipated motions to dismiss by Adams and Blakesley regarding the propriety of the disgorgement claims against them. (See Dkt. No. 157 at 2-3.)

reply memorandums of law in support of their motions. (See "Robson Reply," Dkt. No. 193; "Blakesley Reply," Dkt. No. 190; "Adams Reply," Dkt. No. 192; "Stone Sr. Reply," Dkt. No. 191.)

Additionally, Robson submitted a notice of supplemental authority on July 24, 2023, informing the Court of the United States Court of Appeals for the Second Circuit's decision, SEC v. Ahmed, 72 F.4th 379 (2d Cir. 2023). (See Dkt. No. 215.)

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In other words, a complaint should not be dismissed when the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In resolving a Rule 12(b)(6) motion, the Court's task is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig.,

383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted), aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006); accord In re MF Glob. Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013). In this context, the Court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). The requirement that a court accept the factual allegations in the complaint as true does not, however, extend to legal conclusions. See Iqbal, 556 U.S. at 678.

A district court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

### III. **DISCUSSION**

The Amended Complaint brings four claims against the defendants and relief defendants, alleging that Stone and Robson violated Section 10(b) ("Section 10(b)") of the

Securities Exchange Act of 1934[4] ("Exchange Act") and Rule 10b-5[5] ("Rule 10b-5") promulgated thereunder, by deceptively accessing material, non-public information from the Motley Fool and trading ahead of the public release of that information; that Robson aided and abetted Stone's violations of Section 10(b) and Rule 10b-5 in violation of Section 20(e) of the Exchange Act ("Section 20(e)"); that Robson acted unlawfully through Stone in violation of Section 20(b) of the Exchange Act ("Section 20(b)"); and that Stone Sr., Gwendolyn Stone, Blakesley, and Adams each obtained money, property, and assets which are the proceeds, or are traceable to the proceeds, of Stone and Robson's securities law violations and which must be disgorged.

Now pending before the Court are separate motions to dismiss filed by Robson, Blakesley, Adams, and Stone Sr. The Court will address each in turn, beginning with Robson's motion.

A.   ROBSON'S MOTION TO DISMISS

Robson raises three grounds on which he argues dismissal of the Amended Complaint's claims against him is warranted, and he further argues that disgorgement is not an available remedy in this case. (See Robson Memorandum at 1-2.) First,

---

[4] Codified at 15 U.S.C. § 78j(b).
[5] Codified at 17 C.F.R. § 240.10b-5.

Robson argues that the Section 10(b) and Rule 10b-5 claim fails because the Amended Complaint fails to sufficiently allege that Robson acted with scienter. (See Robson Memorandum at 7-16.)[6] Second, Robson argues that the Amended Complaint fails to sufficiently allege that Robson aided and abetted Stone. (See id. at 16-18.) Third, Robson argues that the Amended Complaint fails to sufficiently allege that Robson acted unlawfully through Stone. (See id. at 18-20.) Additionally, Robson argues that disgorgement is not an available remedy in this action because there are no identified harmed investors to whom disgorged funds would be returned. (See id. at 21-25.)

### 1.   The Section 10(b) and Rule 10b-5 Claim[7]

Robson's opening argument is that the Section 10(b) and Rule 10b-5 claim against him fails because the Amended

---

[6] The Court separately assesses Robson's argument that the aiding and abetting claim also fails because the Amended Complaint does not sufficiently allege Robson acted with scienter.

[7] Under Section 10(b) of the Securities and Exchange Act of 1934, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement *any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.*

15 U.S.C. 78j (emphasis added). Rule 10b-5 is such a rule, rendering it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or

Complaint does not sufficiently allege that he acted with scienter. (See id. at 2, 7-16.)

To state a claim under Section 10(b) and Rule 10b-5, a complaint must allege that the defendant, directly or indirectly, in connection with the purchase or sale of any security (1) employed a device, scheme, or artifice to defraud, or (2) made an untrue statement of material fact or omitted stating a material fact necessary in order to make the statements made not misleading, in the light of the circumstances under which they were made, or (3) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person. See 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. A complaint must also allege that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." S.E.C. v. Obus, 693 F.3d 276, 286 (2d Cir. 2012) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976)).[8]

---

of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[8] The stricter standards of the Private Securities Litigation Reform Act do not govern SEC enforcement actions. See SEC v. Dunn, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) (discussing how the Private Securities Litigation Reform Act applies only to private actions).

As an allegation of fraud, a claim under Rule 10b-5 must satisfy Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other conditions of a person's mind[, such as scienter,] may be alleged generally." Rule 9(b). The "relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations," and the pleading requirements for scienter serve as a counterbalance for this flexibility. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1125, 1128 (2d Cir. 1994) (internal quotation marks and citations omitted).

To "adequately plead scienter, a plaintiff must proffer facts that support a 'strong inference' of a mental state 'embracing intent to deceive, manipulate, or defraud.'" In re Chembio Diagnostics, Inc. Securities Litigation, 616 F. Supp. 3d 192, 197 (E.D.N.Y. 2022) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318 (2007)). Such a mental state "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness, that is, a state of mind approximating actual intent, and not merely a heightened

12

form of negligence." Id. (internal quotation marks and citations omitted); see also Rolf v. Blythe, Eastman Dillon & Co., Inc., 570 F.2d 38, 44-47 (2d Cir. 1978) (holding that allegations amounting to recklessness can satisfy the scienter requirement), cert. denied, 439 U.S. 1039 (1978). Conscious misbehavior or recklessness may be evident in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." S.E.C. v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) (quoting Rolf, 570 F.2d at 46-47) (internal quotation marks omitted). With this context, the Court turns to the parties' arguments.

Like ships passing in the night, the parties largely talk past each other, beginning with a disagreement about the nature of Robson's alleged liability. Robson argues that the Amended Complaint alleges that he is in the position of a traditional "tippee" to insider trading, because there are no allegations that he used stolen credentials or engaged in any other deceptive conduct, only that he traded on information he received from Stone. (See Robson Memorandum at 10-15.) Robson then argues that the Amended Complaint fails to sufficiently allege facts that support a strong inference of scienter -- that he possessed any knowledge that Stone was using stolen Motley Fool credentials to learn of the recommendations in advance. (See id. at 10-16.) Robson

insists instead that the only plausible inference is that he was misled by Stone into believing that Stone was accessing information the Motley Fool was inadvertently making publicly accessible. (<u>See</u> <u>id.</u>)

The SEC retorts that the Amended Complaint alleges that Robson was a participant in the hack-to-trade scheme alongside Stone, that Robson is not in the position of a traditional insider trading tippee, that hack-to-trade schemes are not based on the theory of insider trading, and that Robson is improperly attempting to impose the elements of such a claim onto this case. (<u>See</u> Robson Opposition at 13-14.) The SEC also disputes Robson's position that the Amended Complaint fails to allege any deceptive conduct on his part, noting the Amended Complaint alleges that Robson engaged in multiple instances of deceptive conduct under Rule 10b-5, including: following specific "guidelines" from Stone to avoid regulatory attention, using encrypted email services to discuss trading, and disguising his advance knowledge of the Motley Fool recommendations by selling some of his position in the recommendation picks prior to the announcement. (<u>See</u> <u>id.</u> at 13-14.) The SEC further argues that the Amended Complaint sufficiently alleges that Robson acted with scienter, noting how Robson had the opportunity and motive to commit fraud and pointing to a host of facts in the Amended

Complaint that support a strong inference that Robson acted with scienter. (<u>See</u> <u>id.</u> at 14-17.)

Although the parties are at odds about the specific form of Robson's liability under Section 10(b) and Rule 10b-5, the allegations of scienter are the focus of Robson's Memorandum. The Court finds that the Amended Complaint alleges facts that give rise to a strong inference that Robson acted with scienter. As alleged, Robson had both motive and opportunity to commit fraud. Alternatively, as alleged, Robson acted at least recklessly. For example, Robson repeatedly traded on information that he was told "almost guarantees favorable price moves at a certain time," despite Stone refusing to show Robson how he obtained the information while directing Robson to adhere to a set of "guidelines" that were, at least in part, explicitly intended to avoid regulatory attention. (Amended Complaint ¶¶ 37-39, 40-45.) With such red flags abound, Robson did not need any "technical background or special knowledge with respect to computer science, web design, or computer networking" (Robson Memorandum at 3, 16) for his alleged conduct to be highly unreasonable and represent an extreme departure from the standards of ordinary care. <u>See</u> <u>McNulty</u>, 137 F.3d at 741.

Even if the Court agreed with Robson that the Amended Complaint alleges only "that Robson is in the position of a

traditional 'tippee' to insider trading" (Robson Memorandum at 8), for the same reasons the Court finds Robson to have acted at least recklessly, the Court would find that Robson "had reason to know that confidential information was initially obtained and transmitted improperly (and thus through deception)" and would still find that the Amended Complaint sufficiently alleges facts that give rise to a reasonable inference that Robson acted with scienter when trading. Obus, 693 F.3d at 287-88 (discussing the distinction between the knowledge requirement for tippee liability to attach to a defendant and the knowledge requirement to find that a defendant traded on the tip with scienter).

Accordingly, Robson's motion to dismiss the Section 10(b) and Rule 10b-5 claim against him is **DENIED**.

### 2.  The Aiding and Abetting Claim Under Section 20(e)

Robson next argues that the SEC has not sufficiently alleged a claim against him for aiding and abetting Stone's violation of Section 10(b) and Rule 10-b-5, in violation of Section 20(e), 15 U.S.C. § 78t(e). (See Robson Memorandum at 16-18; Amended Complaint ¶¶ 151-155.)

Section 20(e) permits the SEC to bring civil actions against any person who aids and abets securities fraud. See 15 U.S.C. § 78t(e). The "SEC may bring such an action against 'any person that knowingly [or recklessly] provides

16

substantial assistance' to a primary violator of the securities laws." <u>SEC v. Apuzzo</u>, 689 F.3d 204, 211 (2d Cir. 2012) (quoting 15 U.S.C. § 78t(e)).[9] To state a Section 20(e) claim, the SEC must allege "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." <u>Id.</u> at 206 (citing <u>SEC v. Dibella</u>, 587 F.3d 553, 566 (2d Cir. 2009)). Additionally, these "three requirements cannot be considered in isolation from one another. Satisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance." <u>Dibella</u>, 587 F.3d at 566 (alterations in original and internal quotation marks and citations omitted). For example, "a high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*." <u>Apuzzo</u>, 689 F.3d at 215.

---

[9] As the <u>Apuzzo</u> court noted, the "Dodd-Frank Act of 2010 amended Section 20(e) to add the words 'or recklessly' after 'knowingly.'" <u>Apuzzo</u>, 689 F.3d at 211 n.6. Though that amendment did not apply in <u>Apuzzo</u>, it does here.

Robson does not dispute that the Amended Complaint sufficiently alleges Stone's securities law violation, and for the same reasons noted previously, the Court finds that the Amended Complaint sufficiently alleges that Robson was at least reckless in relation to Stone's securities law violation. (See Robson Memorandum at 16-18.) Thus, the dispute centers on whether the Amended Complaint adequately alleges that Robson provided Stone with substantial assistance. (Id.) To demonstrate that the defendant provided "substantial assistance," the SEC must allege that the defendant "in some sort associated himself with the venture, that the defendant participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." Apuzzo, 689 F.3d at 212 (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938) (alterations in original omitted)).

The Court finds that the Amended Complaint has sufficiently alleged that Robson provided substantial assistance and overall stated a claim for aiding and abetting. As the Amended Complaint alleges, and as the Court noted above, Robson not only traded on the information Stone provided but also followed Stone's guidelines that were, at least in part, explicitly intended to avoid drawing regulatory attention to their activity, thereby allowing

Stone to continue to deceptively access the Motley Fool's recommendations in advance and allowing Stone and Robson to continue to trade on and profit from advance knowledge of the recommendations that they obtained from Stone. (See Amended Complaint ¶¶ 81-83.) In this way, Robson not only associated himself with the venture, but also participated in it as something he wished to bring about and sought to make succeed.

Accordingly, Robson's motion to dismiss the Amended Complaint's aiding and abetting claim against him is **DENIED**.

### 3.   The Indirect Actor Claim Under Section 20(b)

Third, Robson argues that the SEC has not sufficiently alleged a claim against him for acting unlawfully through Stone to deceptively access the Motley Fool's recommendations and trade in advance of the release of those recommendations, in violation of Section 20(b), 15 U.S.C. § 78t(b). (See Robson Memorandum at 18-21; Amended Complaint ¶¶ 156-61.)

Section 20(b) permits the SEC to bring civil actions against any person who "directly or indirectly, [] do[es] any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b).

Robson raises two arguments as to why the SEC's Section 20(b) claim fails. First, Robson contends that the Amended

Complaint fails to allege that Robson controlled Stone, which is required to state a Section 20(b) claim under the "prevailing view among courts, including courts in this district." (See Robson Memorandum at 18-20 (citing Cohen v. Citibank, N.A., 954 F. Supp. 621, 630 (S.D.N.Y. 1996)).) For its part, the SEC disputes that Section 20(b) has such a control element, noting that unlike its immediate predecessor, 15 U.S.C. § 78t(a)[10] ("Section 20(a)"), no "control" language appears in Section 20(b). The SEC also disputes Robson's claim that the "prevailing view" among courts was that Section 20(b) has a control element, as "few reported cases discuss the applicability of Section 20(b)" and most of the cases Robson cites simply cite the Sixth Circuit's 1974 decision in SEC v. Coffey, 493 F.2d 1304 (6th Cir. 1974) without elaborating or engaging in their own analyses. (See Robson Opposition at 18-20.) The SEC argues that Coffey should not guide the Court's analysis, because that decision ignored the lack of a control element in the

---

[10] 15 U.S.C. § 78t(a) provides that

> Every person who, directly or indirectly, *controls* any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such *controlled* person to any person to whom such *controlled* person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the *controlling* person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (emphasis added).

plain language of Section 20(b). <u>See</u> <u>Coffey</u>, 493 F.2d at 1318;

(<u>see</u> Robson Opposition at 19.) The SEC further argues that

the <u>Coffey</u> court assumed that Section 20(a) and 20(b) were

parallel provisions, with Section 20(a) available to private

parties and Section 20(b) available to the government,[11] an

assumption rendered defunct when Congress subsequently

amended Section 20 to make clear that Section 20(a) is also

available to the government.[12] (<u>See</u> Robson Opposition at 19-

20 (citing <u>Coffey</u>, 493 F.2d at 1318).)

The Court holds that Section 20(b) does not contain a

control element. There is no control element in the plain

language of Section 20(b). By contrast, Section 20(a)

explicitly contains a control element, providing that

"[e]very person who, directly or indirectly, *controls* any

person liable under any provision of this chapter or of any

rule or regulation thereunder shall also be liable jointly

and severally with and to the same extent as such controlled

---

[11] In <u>Coffey</u>, the Sixth Circuit held that Section 20(a) was unavailable to the SEC because Section 20(a) "makes a controlling person liable 'to any person to whom such controlled person is liable'" but the SEC was "not a person under Section 20(a), since Section 20(a) was meant to specify the liability of controlling person to private persons. Section 20(b) sets forth the standard of lawfulness to which a controlling person must conform, on penalty of liability in injunction to the SEC or criminal prosecution." <u>Coffey</u>, 493 F.2d at 1318 (quoting 15 U.S.C. § 77t(a)).

[12] Congress subsequently amended the relevant definition of "person" to explicitly include government entities. <u>See</u> 15 U.S.C. § 78c(a)(9); <u>see also</u> <u>SEC v. Smith</u>, No. C2-CV-04-739, 2005 WL 2373849, at *10 (S.D. Ohio Sept. 27, 2005) (discussing <u>Coffey</u> and Congress's subsequent amendment to the definition of "person").

person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a) (emphasis added). Had Congress intended for Section 20(b) to include a control element, it could have included similar language. After all, it "is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." Chicago v. Environmental Defense Fund, 511 U.S. 328, 338 (1994).

This holding is neither a revelation nor a revolution. See S.E.C. v. Strebinger, 114 F. Supp. 3d 1321, 1333-36 (N.D. Ga. 2015) (holding that Section 20(b) did not have a control element). Contrary to Robson's argument, there is not a "prevailing view among courts, including courts in this district [] that Section 20(b) 'requires a showing that a controlling person knowingly used the controlled person to commit an illegal act.'" (See Robson Memorandum at 19 (quoting Cohen, 954 F. Supp. at 630) (internal quotation marks and alterations in original omitted).) Instead, there "is a dearth of authority construing Section 20(b)," Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 158 (2011) (Breyer, J., dissenting), and as the SEC notes (see Robson Opposition at 19-20), almost all of the few cases that do exist merely adopt Coffey's control element holding without analysis. See, e.g., Cohen, 954 F. Supp. at 630

(noting that while "[f]ew reported cases discuss the applicability of Section 20(b), [] it is clear that the section requires a showing that a 'controlling person knowingly used the controlled person to commit the illegal act,'") (quoting <u>Moss v. Morgan Stanley Inc.</u>, 553 F. Supp. 1347, 1362 (S.D.N.Y.), <u>aff'd</u>, 719 F.2d 5 (2d Cir. 1983), <u>cert. denied</u>, 465 U.S. 1025 (1984)); <u>Moss</u>, 553 F. Supp. at 1362 ("[Section 20(b)] has been construed as requiring a showing that the controlling person [] knowingly used the controlled person to commit the illegal act.") (citing <u>Coffey</u>, 493 F.2d at 1318); <u>Securities and Exchange Commission v. Savoy Industries, Inc.</u>, 587 F.2d 1149, 1169-70 (D.C. Cir. 1978) (same). Because these cases do not actually engage with Section 20(b), the Court does not find them to be illuminating.

As for <u>Coffey</u> itself, the Court does not find that decision's holding to be persuasive. In <u>Coffey</u>, the Sixth Circuit held that "[u]nder section 20(b), there must be shown to have been knowing use of a controlled person by a controlling person before a controlling person comes within its ambit." 493 F.2d at 1318. The <u>Coffey</u> court reached this conclusion despite there being no such requirement in the plain language of Section 20(b), and the lone explanation offered was that "[w]ithout such a restriction, every link in

23

a chain of command would be personally criminally and civilly liable for the violations of inferior corporate agents. This was not the congressional intent in enacting section 20(b)." Id.

The Court does not agree that Section 20(b) is so boundless in scope. Section 20(b) is a form of primary liability, not derivative liability, directed at persons who have used another individual or entity to violate the law. Unlike Section 20(a), which provides that every person who controls a person liable for securities law violations is jointly and severally liable to the same extent as the controlled person, Section 20(b) does not impute liability from one person to another, only conduct. As the statute explains, a person is liable under Section 20(b) where they have done an "act or thing" "through or by means of any other person" that would have been "unlawful [under the securities laws] for such person to do" themselves. 15 U.S.C. § 78t(b). Additionally, because the conduct must have been unlawful under the securities laws if the person had done it themselves, the other elements of the substantive violation involved must be present, including the state of mind necessary to establish the underlying substantive violation. Thus, Section 20(b) does not make "every link in a chain of command [] personally criminally and civilly liable for the

violations of inferior corporate agents" absent a control element. <u>Coffey</u>, 493 F.2d at 1318. Accordingly, the Court respectfully concludes that the <u>Coffey</u> court's concern was unwarranted. Moreover, as the Second Circuit has not addressed the issue, this Court is not bound by <u>Coffey</u>, and declines to follow it.

Turning to Robson's second argument, Robson also contends that even if Section 20(b) does not require an allegation of control, the Amended Complaint still fails to state a Section 20(b) claim because Section 20(b) contains a causation element -- that "by its plain language[, Section 20(b)] applies only where a defendant causes another person to do an act or thing that violates the securities laws had the defendant carried out the act themselves." (Robson Memorandum at 20.) Robson's argument continues by asserting that the Amended Complaint merely alleges that he "used Defendant David Stone's deceptive access to the Motley Fool's pick [sic] to trade in advance of those picks," but there is no allegation that Robson used Stone to commit any unlawful act; Stone's trades were not made on Robson's behalf, and Robson engaged in his own allegedly wrongful trades.[13] (<u>Id.</u>

---

[13] To the extent Robson argues that Section 20(b) applies only where the intermediary is entirely blameless, the Court disagrees. (<u>See</u> Robson Reply at 6-7 (noting how the <u>Strebinger</u> court "recognized [that] Section 20(b) is intended to prevent a defendant from escaping liability by structuring

at 20-21; Amended Complaint ¶ 85; Robson Reply at 6-7.) The SEC responds that deceptively accessing non-public information is a violation of the law and that there is no requirement that all acts must be committed by one person for liability under Section 20(b) to attach. (See Robson Opposition at 20.)

The Court finds that the Amended Complaint sufficiently alleges a Section 20(b) claim against Robson. As alleged, Robson deceptively accessed the Motley Fool's recommendations through Stone. Because Robson is also alleged to have traded on the information that Stone obtained, and done so with scienter, had Robson deceptively accessed the recommendations himself, it would constitute a deceptive device hack-and-trade violation under Section 10(b) and Rule 10b-5.[14] The

---

a fraudulent scheme so that an innocent third party actually commits the act that violates the law").) As with the control requirement, there is no such restriction in the plain language of the statute. The Court agrees, however, that Section 20(b) reaches factual patterns that other portions of the Exchange Act do not, including "claims against individuals that perpetrate fraud through the use of non-culpable third parties." Strebinger, 114 F. Supp. 3d at 1335.

[14] To state a claim under the deceptive device hack-and-trade theory of securities fraud, a complaint must allege that the defendant misrepresented their "identity in order to gain access to information that is otherwise off limits," with scienter, and in connection with the purchase or sale of securities. SEC v. Dorozhko, 574 F.3d 42, 44-51 (2d Cir. 2009); Obus, 693 F.3d at 286; see also United States v. Klyushin, 643 F. Supp. 3d 261, 267-68 (D. Mass. 2022). Unlike an insider trading or misappropriation claim, a hack-and-trade claim does not require the presence of a fiduciary duty or a duty of loyalty or confidentiality. See Dorozhko, 574 F.3d at 49-50; United States v. Khalupsky, 5 F.4th 279, 290-91 (2d Cir. 2021) (explaining that "[a]lthough a fiduciary duty is relevant to other securities violations—e.g., insider trading—it need not be shown to prove the securities fraud charged here: fraudulent trading

Court is not persuaded by Robson's arguments to the contrary. First, the plain language of Section 20(b) does not contain a causation element. (Robson Memorandum at 20.) By contrast, the plain language of Section 20(a) does address causation, providing a safe harbor for a controlling person that "acted in good faith and *did not directly or indirectly induce* the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a) (emphasis added). Second, an intermediary need not engage in what would be, by itself, an unlawful act. (Robson Memorandum at 20-21; Amended Complaint ¶ 85; Robson Reply at 6-7.) As discussed above, Section 20(b) imputes the conduct of an intermediary onto a person and considers if that person has violated securities law.

Accordingly, Robson's motion to dismiss the Amended Complaint's Section 20(b) claim against him is **DENIED**.

### 4.   Disgorgement as an Available Remedy

Robson further argues that under the Supreme Court's decision in SEC v. Liu, the SEC may not seek, and the Court

---

in securities by an outsider"), cert. denied sub nom. Korchevsky v. United States, 142 S. Ct. 761 (2022). The full scope of hack-and-trade claims is still being delineated. For example, in Dorozhko in 2009, the Second Circuit stated it was unclear whether "exploiting a weakness in an electronic code to gain unauthorized access is 'deceptive' [for the purposes of Section 10(b) and Rule 10b-5], rather than being mere theft." Dorozhko, 574 F.3d at 51. Similarly, in Khalupsky in 2021, the Second Circuit held that "[r]egardless of how one might characterize the initial [exploit used by hackers to obtain login credentials], the subsequent use of stolen employee login credentials to gain further system access was deceptive." Khalupsky, 5 F.4th at 291.

may not award, disgorgement of Robson's alleged ill-gotten gains because there are no identified wronged investors who would be compensated. (See Robson Memorandum at 21-25 (citing SEC v. Liu, 140 S. Ct. 1936 (2020)).) Specifically, Robson contends that in Liu, "the Supreme Court held that the disgorgement remedy 'generally requires the SEC to return a defendant's gains to wronged investors for their benefit'" and "'the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains'" and paying those gains into the United States Treasury. (Id. (quoting Liu, 140 S. Ct. at 1946, 1948).) Upon review of Liu, however, the Court concludes that disgorgement is not precluded in this case.

In Liu, the Supreme Court considered whether 15 U.S.C. § 78u(d)(5)[15] "authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing." Liu, 140 S. Ct. at 1942. The Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." Id. at 1940. The Court noted that Congress had

---

[15] 15 U.S.C. § 78u(d)(5), also known as Section 21(d)(5) of the Exchange Act, provides that "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the [Securities and Exchange] Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

incorporated "longstanding equitable principles into § 78u(d)(5)" that "prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing." Id. at 1946. However, the Court "d[id] not decide" whether a disgorgement award "is unlawful because it crosses the bounds of traditional equity practice" where an award fails to return funds to victims, imposes joint-and-several liability, or declines to deduct business expenses from the award. Id. at 1947. This was "[b]ecause the parties focused on the broad question whether any form of disgorgement may be ordered and did not fully brief these narrower questions." Id. Rather, the Supreme Court "discuss[ed] principles that may guide the lower courts' assessment of these arguments on remand." Id. The portions of Liu that Robson relies on appear in the course of this discussion. (See Robson Memorandum at 21-25; Robson Reply at 7, 9.)

Of foremost relevance here, the Supreme Court observed that "[i]t is an open question whether, and to what extent," "the SEC's practice of depositing disgorgement funds with the Treasury [] where it is infeasible to distribute the collected funds to investors . . . nevertheless satisfies the SEC's obligation to award relief 'for the benefit of investors' and is consistent with the limitations of § 78u(d)(5)." Liu, 140 S. Ct. at 1948. The Supreme Court noted that it "need not

address the issue here," because the "parties d[id] not
identify a specific order in this case directing any proceeds
to the Treasury," and "[i]f one is entered on remand, the
lower courts may evaluate in the first instance whether that
order would indeed be for the benefit of investors as required
by § 78u(d)(5) and consistent with equitable principles." Id.
Thus, as other courts have recognized, Liu did not foreclose
disgorgement in cases where it is infeasible to distribute
the disgorged funds to harmed investors. See SEC v. Westport
Cap. Markets, LLC, 547 F. Supp. 3d 157, 170 (D. Conn. 2021)
(explaining that Liu "did not foreclose disgorgement" where
it is "infeasible for some reason" to "identify the investors
who were affected . . . or return the funds to them"); SEC v.
Bronson, 602 F. Supp. 3d 599, 618 (S.D.N.Y. 2022) (finding
the same and holding that a disgorgement award was consistent
with Liu where the final judgment did not identify any harmed
investors to whom the disgorged profits would be returned),
aff'd, No. 22-1045-CV, 2022 WL 5237474 (2d Cir. Oct. 6, 2022),
cert. denied, 143 S. Ct. 2643 (2023); SEC v. Spartan Sec.
Grp., Ltd., 620 F. Supp. 3d 1207, 1224 (M.D. Fla. 2022)
(holding that a disgorgement award could be directed to the
Treasury post-Liu and collecting cases), appeal pending, 22-
13129 (11th Cir.); SEC v. O'Brien, --- F. Supp. 3d ---, 2023
WL 3645205, at *13 (S.D.N.Y. May 25, 2023) (holding that the

disbursement of disgorged funds to the Treasury post-Liu was
appropriate where "it would be enormously difficult, if not
impossible, to identify all those harmed by [defendant's]
activity and to disburse the disgorgement funds to those
investors."), appeal pending, 23-1071 (2d Cir.).

Additionally, the portions of Liu that Robson relies on
do not countenance a different conclusion, because they were
made in response to a separate circumstance. As Robson argues,
the Supreme Court noted that "[t]he equitable nature of the
profits remedy generally requires the SEC to return a
defendant's gains to wronged investors for their benefit,"
and that "the SEC's equitable, profits-based remedy must do
more than simply benefit the public at large by virtue of
depriving a wrongdoer of ill-gotten gains. To hold otherwise
would render meaningless the latter part of § 78u(d)(5)." Liu
at 1948. The Supreme Court discussed these points, however,
regarding the government's practice of depositing
disgorgement proceeds in the Treasury instead of disbursing
them to victims[16] and the government's related argument that
disgorgement constitutes a remedy that is "appropriate or
necessary for the benefit of investors" under § 78u(d)(5) as
long as wrongdoers are deprived of their ill-gotten gains.

---

[16] The Supreme Court noted "the SEC ha[d] not returned the bulk of funds
to victims" of the defendants' fraud. Liu, 140 S. Ct. at 1947.

See id. at 1946 (describing the practice of "ordering the proceeds of fraud to be deposited in Treasury funds *instead* of disbursing them to victims" to be "in considerable tension with equity practices" (emphasis added)); See id. at 1947-48. As such, even if the Supreme Court had not explicitly stated that the issue here was an "open question," the language relied on by Robson applies to a different circumstance.

For these reasons, the Court concludes that the disgorgement claim against Robson may proceed. Should the SEC prevail in its case against Robson and seek a disgorgement order that directs the disgorged funds to the Treasury because no harmed investors have been able to be identified, the Court may assess at that juncture whether such an order would be "for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles." Liu, 140 S. Ct. at 1949.

Accordingly, Robson's request that the Court enter an order holding that the SEC may not seek disgorgement against him is **DENIED**.

B.   BLAKESLEY'S MOTION TO DISMISS

The Amended Complaint alleges that Blakesley obtained money, property, and assets that are the proceeds, or are traceable to the proceeds, of Stone's and Robson's securities

law violations. (See Amended Complaint ¶¶ 162-65.) The
Amended Complaint seeks disgorgement of those proceeds
pursuant to Section 6501 of the National Defense
Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283,
134 Stat. 3388, 4625-26 (2021), now codified at 15 U.S.C.
§§ 78u(d)(8)(A)-(B).

A court "may order equitable relief[, such as
disgorgement,] against a person who is not accused of
wrongdoing in a securities enforcement action where that
person: (1) has received ill-gotten funds; and (2) does not
have a legitimate claim to those funds." S.E.C. v. Cavanagh,
155 F.3d 129, 136 (2d Cir. 1998). Though the Second Circuit
has not "developed explicit guidelines for what qualifies as
a 'legitimate claim.' [it] has held that the receipt of
property as a gift, without the payment of consideration,
does not create a 'legitimate claim' sufficient to immunize
the property from disgorgement." Commodity Futures Trading
Comm'n v. Walsh, 618 F.3d 218, 226 (2d Cir. 2010).

Blakesley moves to dismiss the Amended Complaint's claim
against him pursuant to Rule 12(b)(6) on two grounds. First,
Blakesley argues that the Amended Complaint fails to
adequately allege that the money in Blakesley's account was
derived from unlawful trades by Blakesley. (See Blakesley
Memorandum at 5-9.) Specifically, he argues that the Amended

Complaint fails to adequately allege that Blakesley, or someone else trading in his account,[17] received and traded on material, non-public information. (See id.) The Court disagrees.

Blakesley conflates the requirements for alleging someone is a relief defendant with being a tippee defendant. To sustain its claim against Blakesley, the SEC need only sufficiently allege that Blakesley has received ill-gotten funds to which he does not have a legitimate claim, which it has done here. See Cavanagh, 155 F.3d at 136. The Amended Complaint is replete with specific allegations and circumstantial evidence regarding the ill-gotten nature of the funds in Blakesley's account. For example, the Amended Complaint alleges that Blakesley opened a brokerage account only in February 2021 and then, for nearly a year, that the account traded almost exclusively in Motley Fool recommendations prior to the recommendations being publicly announced; that thirty-seven of the thirty-nine times Blakesley's account purchased call options regarding what would be announced as a Motley Fool recommendation occurred

---

[17] Blakesley addresses this alternative because the Amended Complaint notes that "IP information indicates that there was significant overlap between the IP addresses used to log in to Robson's, Blakesley's, and Adams's accounts. This overlap is consistent with one person placing trades in all of the relevant accounts, or with the individuals being in the same location when the trades were placed." (Amended Complaint ¶ 124.)

only after a communication took place between Stone and Robson, and that the account mirrored the purchases and sales engaged in by Stone and Robson. (See Amended Complaint ¶¶ 120-125.) Over the course of thirty-nine well-timed trades, Blakesley generated more than $1 million in his account. On top of these extensive allegations, the Amended Complaint asserts that "there was significant overlap between the IP addresses used to log in to Robson's, Blakesley's, and Adams'[s] accounts," such as the purchase of call options and the sale of positions regarding stock by Blakesley and Robson using the same IP address. (See Amended Complaint ¶¶ 124, 130-131, 142, 144.) Funds are no less ill-gotten, and a relief defendant's claim of legitimacy is no stronger, if a relief defendant was to provide the seed money and their account credentials to someone else, and let that person make the trades in their account. In sum, as alleged, there is a clear connection between the funds in Blakesley's account and the alleged deceptive access of material, non-public information Stone obtained improperly from the Motley Fool that was shared and illicitly traded on.

Second, Blakesley argues that the Amended Complaint fails to adequately allege that Blakesley, or someone else trading in his account, "knew or was reckless in not knowing that" the information they were trading on was obtained

35

unlawfully. (Id.)[18] As the SEC notes, however, Blakesley is named only as a relief defendant, and there is no requirement that the SEC allege that a relief defendant acted with scienter. (See Blakesley Opposition at 2, 10-12.) Additionally, Blakesley's argument that the Amended Complaint must allege that if someone else was trading on his account they acted with scienter is also meritless. Whether the funds in Blakesley's account are ill-gotten does not turn on whether the person acted with scienter. As the Court has already found, the Amended Complaint sufficiently alleges that Blakesley has received ill-gotten funds to which he does not have a legitimate claim.

Finally, Blakesley adopts Robson's arguments regarding the SEC's inability to obtain disgorgement in this case. (See Blakesley Memorandum at 4 n.1.) For the reasons discussed above, the Court denies Blakesley's request that the Court enter an order holding that the SEC may not seek disgorgement against him.

Accordingly, Blakesley's motion to dismiss the disgorgement claim against him is **DENIED**.

---

[18] The Court reads Blakesley's Memorandum as primarily raising the arguments described here. To the extent Blakesley raised other arguments, the Court does not find them to be persuasive.

C.   <u>ADAMS'S MOTION TO DISMISS</u>

The Amended Complaint alleges that Adams obtained money, property, and assets that are the proceeds, or are traceable to the proceeds, of Stone's and Robson's securities law violations. (<u>See</u> Amended Complaint ¶¶ 162-165.) As with the other relief defendants, the Amended Complaint seeks disgorgement of those proceeds.

As noted above, a court "may order equitable relief[, such as disgorgement,] against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." <u>Cavanagh</u>, 155 F.3d at 136.

Adams moves to dismiss the Amended Complaint's claim against him on four grounds. First, Adams contends that the Amended Complaint fails to set forth facts sufficient to state a claim for a disgorgement remedy following the Supreme Court's decision in <u>Liu</u>, because <u>Liu</u> "held that disgorgement is available in insider trading cases 'when assessed against only culpable actors,'" but the SEC does not allege that Adams engaged in any wrongdoing. (<u>See</u> Adams Memorandum at 4-7 (quoting <u>Liu</u>, 140 S. Ct. at 1946).) The Court does not agree

that Liu imposed such a sweeping limitation, and Adams does not cite any precedent to the contrary.

Second, Adams joins Section IV of the Robson Memorandum regarding disgorgement. (See Adams Memorandum at 1, 6-7.) This argument fails for the reasons the Court stated regarding Robson's arguments above.

Third, Adams argues that the Amended Complaint does not sufficiently allege that Adams's funds were ill-gotten. On this point he raises largely the same arguments that Blakesley advanced. (See Adams Memorandum at 7-9.) The Court reaches the same conclusions regarding Adams's contentions as applied to the allegations against Adams, consistent with Blakesley's arguments as applied to the allegations against Blakesley. Thus the Court finds that the Amended Complaint sufficiently alleges that Adams received ill-gotten gains to which he does not have a legitimate claim.

Fourth, Adams joins the reasoning and analysis of the Blakesley Memorandum at pages 5-14, which is the entirety of the argument section of that brief. (See Adams Memorandum at 1, 7-8.) This argument fails for the same reasons the Court stated regarding Blakesley's arguments above.

Accordingly, Adams's motion to dismiss the disgorgement claim against him is **DENIED**.

38

D.   <u>STONE SR.'S MOTION TO DISMISS</u>

The Amended Complaint alleges that Stone Sr. obtained money, property, and assets that are the proceeds, or are traceable to the proceeds, of Stone's and Robson's securities law violations. (<u>See</u> Amended Complaint ¶¶ 162-165.) As with the other relief defendants, the Amended Complaint seeks disgorgement of those proceeds.

Stone Sr. moves to dismiss the Amended Complaint's claim against him by joining Section IV of the Robson Memorandum regarding disgorgement (<u>see</u> Robson Memorandum at 21-25), joining the reasoning and analysis of the Blakesley Memorandum, and joining the Adams Motion. (<u>See</u> Stone Sr. Motion at 2.)

Before addressing Stone Sr.'s arguments, the Court first considers whether Stone Sr.'s Motion is procedurally barred because he already filed an answer to the Amended Complaint. (<u>See</u> "Answer," Dkt. No. 101.) As the SEC notes, the Stone Sr. Motion is made pursuant to Rule 12(b)(6), however, under Rule 12(b)(6), a "motion asserting [failure to state claim] must be made before pleading," which is incompatible with Stone Sr. having already filed an answer. Rule 12(b)(6) ("A motion asserting [failure to state a claim] must be made before pleading if a responsive pleading is allowed."); (<u>see</u> Stone Sr. Motion at 2; Stone Sr. Opposition at 1-2.) Stone Sr. does

39

not dispute this conclusion but instead asks that the Court treat the Stone Sr. Motion as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) ("Rule 12(c)"). (See Stone Sr. Reply at 2.)

Rule 12(c) provides that "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." Rule 12(c). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). The "standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim"; "[i]n both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001). Moreover, a "motion to dismiss for failure to state a claim . . . that is styled as arising under Rule 12(b) but is filed after the close of pleadings, should be construed by the district court as a motion for judgment on the pleadings under Rule 12(c)." Id. Accordingly, the Court construes Stone Sr.'s Motion as a motion for

judgment on the pleadings and finds it is not procedurally barred.

That said, the Court does not find the arguments in Blakesley's Memorandum and Robson's Memorandum any more persuasive when raised by Stone Sr. The Court finds that the Amended Complaint sufficiently alleges that Stone Sr. received ill-gotten funds to which he does not have a legitimate claim, and the SEC is not foreclosed from bringing a disgorgement claim against him.[19]

Accordingly, Stone Sr.'s motion for judgment on the pleadings regarding the disgorgement claim against him is **DENIED**.

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 172) filed by defendant John D. Robson ("Robson") to dismiss the amended complaint ("Amended Complaint," Dkt. No. 97), pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) ("Rule 12(b)(6)") is **DENIED**; and it is further

---

[19] As noted above, Stone Sr. also stated he "joins the Motion to Dismiss filed by Relief Defendant Brett R. Adams," but does not refer to the Adams Memorandum. (Stone Sr. Motion at 2.) To the extent this circumstance constitutes an error on Stone Sr.'s part, it makes no difference because the Court does not find any of the arguments raised in the Adams Memorandum to have merit, including as applied to Stone Sr.

**ORDERED** that the motion (Dkt. 174) filed by relief defendant Justin Blakesley ("Blakesley") to dismiss the Amended Complaint, pursuant to Rule 12(b)(6) is **DENIED;** and it is further

**ORDERED** that the motion (Dkt. No. 176) filed by relief defendant Brett R. Adams ("Adams") to dismiss the Amended Complaint pursuant to Rule 12(b)(6) is **DENIED;** and it is further

**ORDERED** that the motion (Dkt. No. 178) filed by relief defendant Harold Stone ("Stone Sr.") for judgment on the pleadings pursuant to Rule 12(c) is **DENIED;** and it is further

**ORDERED** that defendant Robson and relief defendants Blakesley and Adams are directed to file an answer to the Amended Complaint within twenty-one (21) days of the date of this Decision and Order.


**SO ORDERED.**

Dated:      New York, New York
            29 September 2023

_____
              Victor Marrero
              U.S.D.J.